**People of the State of Illinois, Plaintiff-Appellee, v. Richard Payton (Impleaded), Defendant-Appellant.**

Gen. No. 53,215.

First District, Fourth Division.

April 22, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Shelvin Singer and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Robert B. McGee, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE DRUCKER delivered the opinion of the court.

Defendant was convicted after a bench trial of the offense of armed robbery. He was sentenced to a term of five to ten years. Defendant raises three points on appeal: (1) the method used for identification was so highly suggestive and conducive to mistaken identity as to re-

quire reversal; (2) it was error to introduce into evidence a gun which was never connected with him; and (3) it was error to consider a police officer's testimony as to defendant's statements obtained in violation of his constitutional rights, even though defense counsel did not raise any objection at the time the officer testified.

Testimony of Fred G. Anderson, complaining witness, for the State:

He lives at 2355 East 74th Street in Chicago. On May 24, 1967, he was working as a bartender at the South Side Swedish Club. He finished working at 1:00 a. m. on May 25, 1967. He drove home and parked his car about a quarter of a block from his home. When he got in front of his house two men, a tall one and a shorter one, came down the street towards him. As they approached him they separated and the little one (defendant) got hold of his arm and started twisting it up. The taller man (Erman Haskins) grabbed him by the throat and started to pistol-whip him. The taller man had the weapon. He required nine stitches to close the wounds. His wallet with his paycheck for $180 was taken during the robbery by the defendant.

He started to holler and his wife and neighbors heard the commotion and called the police. Several minutes later a squad car came by with two police officers, Beam and Schultz. They asked him to get in the car and describe his assailants, which he did. The squad car then drove west on 74th Street and down Crandon between 71st and 72nd. He pointed out the two suspects as the ones who robbed him. He was told to stay in the car. The taller assailant ducked into a gangway and the officers followed him. After that he heard shots.

He saw the defendant at 2:00 or 2:15 a. m. in Billings Memorial Hospital. A police officer later gave him back his wallet with the paycheck still inside it.

80

On the morning of May 25 the lighting conditions in front of his house were good. He uses hundred watt bulbs in the entrance on the first and second floors of his building to light up the front. He could see the defendant "plain then and there." His assailants came around the corner on Yates and walked towards him. When he got in front of his doorway they separated and grabbed him from the back.

He had never seen the defendant before. The taller man (Haskins) was wearing a light gray topcoat with a tam or beret. He was a Negro of light complexion and was about six feet or six feet one in height. The shorter man (defendant) was also a Negro and he was wearing a three-quarter length dark brown coat. He was not wearing a hat. He did not notice the color of their trousers. He knew the taller man had a gun because he saw it. The taller man had a gun in his hand and he saw "a flash of chrome" as he was hit. He identified the gun at the police station.

After he was taken to the hospital, he identified a man in the emergency room as the taller man who had robbed him, Erman Haskins. This man had been shot by the police. "The police didn't put nothing in my head" as to who the man was.

He saw the shorter man (defendant) when the police brought him into the hospital. The man was handcuffed. The police said, "We brought in a suspect." He was thirty feet away when he first saw the defendant at the hospital and he moved closer to him to take a good look. He identified him as the other robber.

He identified defendant in court as one of the men who robbed him. He also identified a gun as the one used to pistol-whip him.

Testimony of Alfred Schultz, for the State:

He is a police officer. On May 25, 1967, his partner and he responded to a call at approximately 1:20 a. m. of a

man needing assistance at 2355 East 74th Street. When they arrived they observed a white man standing there, bleeding from the head. The man identified himself as Fred Anderson. They placed him in the back of the squad car.

They drove westbound on 74th and then turned northbound on Crandon. Between 72nd and 71st "Mr. Anderson called to us and pointed out one of the offenders that was walking down the street." Mr. Anderson remained in the squad car and they chased the man down an alley. Another car had responded to the "lookout message" they had made immediately after Mr. Anderson was placed in the squad car. They ordered the man to halt. They noticed a nickel-plated revolver in his hand and they opened fire. The man fell to the ground. They took the gun from him and called for a wagon. They had a conversation with the man, Erman Haskins, and then put out another lookout message giving a full description and name of the second offender, Rick Payton. They took Mr. Anderson to Billings Hospital.

They were in full uniform when they gave chase to Erman Haskins. Mr. Anderson described Haskins as "a male Negro, approximately six foot, approximately 185 to 190, a light complexion, wearing a brown coat, dark pants and a tan hat." Mr. Anderson described the defendant as "a male Negro, approximately 5,8 to 5,10, between 165 and 175, wearing dark pants." He was also wearing a light colored coat and a cap.

Mr. Anderson observed Haskins as they were wheeling him into the hospital. Mr. Anderson stated that "that was the man that attacked him." He never told Mr. Anderson that Haskins was a suspect.

He identified the gun introduced into evidence as the one seized from Haskins.

Testimony of Gerald Beam, for the State:

He is a police officer. He corroborated the testimony of his partner, Alfred Schultz. He also identified the gun as the one taken from Haskins after he had been shot. The gun was unloaded when they took it from Haskins.

Testimony of Richard Grublesky, for the State:

He is a police officer. He was on duty the evening of May 24, 1967, with his partner, Robert Ford. At approximately 2:15 a. m. he arrested the defendant at 2205 East 71st Street. The defendant told him that he was coming from work after he had stopped at a friend's house. Defendant stated that his friend lived down the street, but he did not give an address. He searched the defendant and found a wallet containing Fred Anderson's identification and a check made payable to Fred Anderson for $180. The defendant also had his own wallet. At the time of his arrest, approximately fifty-five minutes after the robbery, defendant was wearing dark trousers and a light color tan coat. He was arrested about three and one-half blocks from the scene of the robbery.

Defendant was taken to the hospital approximately fifteen minutes after his arrest. Mr. Anderson identified the defendant as one of the assailants. He never told Mr. Anderson that he had a suspect. Defendant was handcuffed when Mr. Anderson identified him.

In court he identified the defendant as the man he arrested.

Testimony of Robert Ford, for the State:

He is a police officer. He corroborated the testimony of Officer Grublesky. He also identified the defendant as the man his partner and he arrested.

During his direct examination defense counsel objected to his describing a conversation with defendant at the time of his arrest. He objected on the ground that the

defendant had not been given the Miranda warnings and asked the court to strike Officer Ford's testimony as well as Officer Grublesky's testimony. The court sustained counsel's objection as to Officer Ford's testimony dealing with the defendant's statements made to him after his arrest. The court overruled the motion to strike Officer Grublesky's testimony as it was not made in apt time.

He did not notify Mr. Anderson that he had a suspect before Mr. Anderson identified the defendant at the hospital. Mr. Anderson never said, "I can't be sure" when he identified defendant.

Testimony of Richard Payton, defendant, in his own behalf:

Prior to his arrest he never knew Erman Haskins. He was not with him on May 25, 1967. The first time he saw Haskins was at Billings Hospital. On the night of his arrest he was coming from the License Lounge at 2338 East 71st Street. He heard gunshots while he was inside the lounge and came outside with some other people. He stayed there about ten minutes and started walking down the street. He was going down to the Pumpkin Room at 2015 East 71st Street. He found a wallet on the sidewalk by 71st and Crandon. He never told the police that he was coming from a friend's house or from work.

On cross-examination he testified that he is also known by the name of Alfonso Willoughby. He knew several people at the lounge by their faces but he did not know their names. He goes to this lounge about every week. He did not know the lady tending bar.

After the officers searched him and found Mr. Anderson's wallet, he told them he had just picked it up on the previous corner. He told Officer Grublesky he was on his way to the Pumpkin Room. He had never seen Mr. Anderson before his arrest. He never robbed Mr. Anderson.

Testimony of Erman Haskins, for the defense:

He had pleaded guilty to the robbery of Fred Anderson but had not been sentenced. He waived his privilege against self-incrimination.

"(O)n the night of May 24, I had just left my job and I was on my way home. I was living at 6914 South Cornell. And I stopped in a lounge to have a drink. And in doing so, I met a friend. To you he's Mr. X." This friend was not the defendant.

Both his friend and he needed money and they went to his house to plan the robbery. They dressed alike, each wearing a gray coat, tan hat and sunglasses. He took his father's .25 automatic pistol. They left the house and proceeded to 71st Street. "As I made this turn, the fellow that was with me said, 'There's a fellow getting out of a car.' I said, 'Yes.' He said, 'Let's see what he's going to do.' "

They then proceeded to rob Mr. Anderson and he began to holler. They split up and fled the scene. He ran into an alley with the police in pursuit. He attempted to throw the wallet away but did not have a chance. The officers then shot him. He passed out after ten minutes. He never mentioned Rick or Richard Payton.

He first saw Payton about a month after his recovery from the bullet wounds.

On cross-examination he testified that he had been convicted for two prior felonies, robbery and the Dyer Act (the transportation of stolen motor vehicles in interstate or foreign commerce).

When asked to tell his friend's name he answered, "Big John." He did not know his address. He described him as a male Negro, light complexion, six-one in height and weighing 195 to 200 pounds. He had known Big John for quite some time. On the night of the robbery he met Big John at the Tropicana Lounge. Other people saw him there. He took Mr. Anderson's wallet but he never pistol-

85

whipped him. Big John never pistol-whipped him either, but Big John did hit Mr. Anderson with his fist.

As he was fleeing from the police he tried to get rid of the wallet and he dropped it or "throwed it." He never made any statement to the police about Rick Payton.

Testimony of Samuel Brewster, in rebuttal for the State:

He is a police officer. On March 24, 1964, he arrested a man named Alphonso Willoughby.

A conviction statement of one Alphonso Willoughby was then admitted into evidence. It showed that he had pleaded guilty to the offense of robbery and had been sentenced to one to five years.

Testimony of Alfred Schultz, in rebuttal for the State:

Erman Haskins was shot on the southwest corner of 71st and Crandon. At no time did he observe Haskins throw a wallet from his person.

Opinion

Defendant contends that the method used for identification was so highly suggestive and conducive to mistaken identity as to require a reversal of his conviction. During direct examination complainant identified defendant as one of the men who robbed and beat him. On cross-examination he testified that while he was at the hospital receiving treatment for his wounds the police brought in a man who was handcuffed. The police told him that they brought in a suspect and to take a good look at him. He identified this man as one of the assailants. The identification took place approximately forty-five to sixty minutes after the robbery.

From these facts and circumstances we believe this pretrial identification may well have been unnecessarily suggestive and that a properly conducted lineup could have been arranged at a later time. People v. Cook, 113 Ill App2d 231, 252 NE2d 29. However, in Cook, supra, 236, this court found that:

Where a defendant does present sufficient evidence to establish the unfairness of the pretrial identification confrontation, an in-court identification may nevertheless be admissible if it is shown, by clear and convincing evidence, that the courtroom identification had an independent origin, arising from an earlier uninfluenced observation of the defendant. See People v. Blumenshine, 42 Ill2d 508, 250 NE2d 152; and People v. McMath, supra.

The complainant had previously observed his assailants at the time of the crime and he gave a description of them to the police while he was in the squad car. The sidewalk in front of his doorway was well lighted. Defendant calls attention to the discrepancies between the complainant's testimony concerning descriptions of his assailants and the testimony of the police officers in which they related those descriptions. Although complainant testified that the descriptions he gave the police were sparse, nevertheless he immediately pointed out Haskins on the street and was positive in his identification of defendant at trial. He also testified that when he saw the defendant on 74th Street in front of his doorway he "could see him plain right then and there."

It should be noted also that Officers Beam and Schultz radioed in a full description of the defendant, including his name, after capturing Haskins. In addition, there is independent corroborating evidence in the form of complainant's wallet which was found in the defendant's possession when arrested by Officers Grublesky and Ford. People v. Cook, supra; People v. Hampton, 121 Ill App2d 76, 257 NE2d 190; and People v. Bey, 42 Ill2d 139, 246 NE2d 287. See also People v. McMath, 45 Ill2d 33, 256 NE2d 835.

██ We find that there was a sufficient opportunity for the complainant to observe the defendant as one of his assailants at the time of the crime, and that this prior

uninfluenced observation constituted an independent and adequate basis to support his in-court identification.

Defendant also contends that it was error to introduce into evidence a gun which was never connected with him. In People v. Aughinbaugh, 36 Ill2d 320, 223 NE2d 117 (reversed and remanded on other grounds), the defendant also claimed that a gun identified as similar in size, shape, weight and color to the one used by defendant's accomplice should not have been admitted into evidence. The complainant testified that defendant's accomplice pointed a gun at him during a robbery and there was testimony that this same gun was taken from defendant's accomplice by a police officer at the time of his arrest. The court, at page 326, found that:

> Even though not used by defendant personally, this was sufficient evidence to connect the gun with the crime in which defendant participated. (People v. Johnson, 35 Ill2d 516; People v. McCasle, 35 Ill2d 552, 221 NE2d 227.) It did possess probative value in that its possession by the accomplice when arrested corroborated the State's witnesses, and we find no error in its admission.

See also People v. Ashley, 18 Ill2d 272, 164 NE2d 70, and People v. Givans, 83 Ill App2d 423, 228 NE2d 123.

In the instant case complainant testified that he was pistol-whipped. The gun taken from Haskins at the time of his arrest was identified by the complainant and by the arresting police officers. Therefore, we find that where it appears that a defendant participated in a crime in which a weapon was used, this weapon may be admitted into evidence even though he himself did not wield or possess it. People v. Ashley, supra, and People v. Maciejewski, 294 Ill 390, 128 NE 489.

Defendant also argues that it was error to consider a police officer's testimony as to his admissions obtained in

violation of his constitutional rights even though his counsel did not raise any objection until after the testimony was given. Defendant was arrested approximately one hour after the robbery of Mr. Anderson and three and one-half blocks away from the scene of the crime. Officers Grublesky and Ford testified that they began questioning the defendant immediately after they arrested him. They asked him where he was coming from and where he was going at this late hour. Each officer testified that the defendant told them he was coming from work after stopping at a friend's house somewhere down the street. Neither officer testified as to informing defendant of the Miranda warnings * before they began questioning him.

Defendant denied making the alleged statements to the officers. He testified that when Officer Grublesky asked him where he was coming from he told him that he was coming from the License Lounge and was on his way to the Pumpkin Room. Furthermore, when Officer Grublesky asked him where he got Mr. Anderson's wallet, he told the officer he just picked it up on the previous corner.

During the direct examination of Officer Ford, defense counsel objected to his relating the contents of the conversation with defendant made after his arrest. Counsel objected on the ground that defendant had not been given the Miranda warnings subsequent to his arrest. He moved that the testimony of both Officers Ford and Grublesky relating to this conversation with the defendant be stricken. The court sustained counsel's objection and motion to strike Officer Ford's testimony but overruled the motion to strike Officer Grublesky's testimony. No objection was made during Officer Grublesky's testimony as to the failure to give the Miranda warnings,

---

* Miranda v. Arizona, 384 US 436.

89

and the court found that objection to the testimony and the motion to strike were not made in apt time.

In People v. Trefonas, 9 Ill2d 92, 98, 136 NE2d 817, the court found that:

> The function of the objection is, first, to signify there is an issue of law, and, secondly, to give notice of the terms of the issue. An objection to the admission of evidence, to be available, must be made in apt time, or it will be regarded as waived. The general rule is that the admission of incompetent evidence must be objected to, if at all, at the time of its admission. . . . Failure to make proper and timely objection to the admission of evidence claimed to be incompetent or otherwise objectionable or to move to strike it out after its admission, giving specific reason for the objection or motion to strike out such evidence generally constitutes a waiver of the right to object and cures the error, if any. . . . A party cannot sit by and permit evidence to be introduced without objection and upon appeal urge an objection which might have been obviated if made at the trial.
>
> While the accused has the right to insist that only competent evidence shall be introduced against him, yet he may waive such right and does do so by failure to interpose in apt time proper objections. (People v. Jennings, 298 Ill 286; Simons v. People, 150 Ill 66.) Objections to evidence may be waived even though based on constitutional grounds for the defendant may by a plea of guilty or a confession waive the production of all evidence of his guilt. People v. Schultz-Knighten, 277 Ill 238.

 In the instant case we find no reversible error in the court's refusal to strike the testimony of Officer Grublesky.

We would note that neither the defense nor the prosecution made any further reference during closing argument to the statements testified to by Officer Grublesky.

The judgment is affirmed.

Affirmed.

ENGLISH and LEIGHTON, JJ., concur.